DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Peninsula Asset Management (Cayman), Ltd., et al., | ) | CASE NO. 5:04 CV 1153 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | <u>MEMORANDUM OPINION</u> |
| v. | ) | (Resolving Doc. Nos. 161, 162,163, 168, |
| | ) | 169, 176, 177, 178, & 179) |
| Hankook Tire Co., Ltd., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>INTRODUCTION</u>

Factually, this is a complex case. In its barest terms, Plaintiffs assist companies in their financing arrangements in international finance markets.  Defendant, or its related company, paid Plaintiffs to help it raise capital in one transaction. Plaintiffs claim as a result of its work on that one issue, Plaintiffs got caught in the tangled web of Defendant's offshore financing arrangements and that Plaintiffs' reputation suffered causing damages.

The case presents more straightforward legal issues. In this diversity action, Plaintiffs allege breach of an indemnity agreement between Plaintiffs and an offshore corporation for which Defendant should be held liable. Claims are also made based on fraud/fraudulent inducement, negligent misrepresentation and civil conspiracy. Defendant denies the allegations.

Moreover, Defendant Hankook Tire Co., Ltd. ("Defendant" or "Hankook") has filed a motion for summary judgment (Docket No. 163).   Plaintiffs Karen Chongah Han ("Han"), No Joon Park ("Park") and Peninsula Asset Management (Cayman) Ltd. ("Peninsula") have filed a response brief (Doc. No. 165 ) and Defendant has filed a reply brief  (Doc. No. 167).

(5:04 CV 1153)

The evidence submitted with respect to the summary judgment motion has itself attracted several motions. Defendant  has filed a motion to exclude the testimony of Plaintiff's expert James G. Herblin (Doc. No. 169), a motion Plaintiffs have opposed (Doc. No. 171) and for which Defendant has filed a reply brief in support (Doc. No. 173). Defendant has also filed a motion to strike (Doc. No. 168) various portions of evidence submitted by Plaintiff in response to the motion for summary judgment. Plaintiffs oppose the motion to strike (Doc. No. 170) and Defendant has filed a reply brief in support of the motion (Doc. No. 172).

Plaintiffs have filed their own Motions to Strike (Docket Nos. 176, 177, 178, & 179), challenging the testimony of four of Defendant's expert witnesses. Defendant has responded to those motions (Docket Nos. 180, 181, 182 & 183).

Defendant also advises the Court that is seeks a determination of certain issues presented in the this matter according to the laws of Korea and/or Malaysia (Docket Nos. 161 &162). Plaintiff has responded to that notice (Docket No. 164) and Defendant has filed a reply brief in support of its position on that issue (Docket No. 166).

For the following reasons, Defendant's motion for summary judgment (Doc. No. 163) is granted.  Further, the Court denies as moot the motion to exclude the testimony of the expert (Doc. No. 169).  Further, the Court denies as moot Defendant's motion to strike (Doc. No. 168). Plaintiffs' Motions to Strike are denied as moot (Docket Nos. 176-179). Finally, the Court addresses the issue of reliance on foreign law at various points in this Memorandum Opinion as the matter is required to be resolved. Insofar as the "notice" has been deemed a motion to apply foreign law, they are also denied as moot (Doc. Nos. 161&162).

2

(5:04 CV 1153)

## FACTUAL BACKGROUND

### Description of Parties

On June 17, 2004, plaintiffs filed the complaint.  Plaintiff Karen Chongah Han ("Han") is a citizen of the State of Texas, who resides there with her husband, plaintiff No Joon Park ("Park").  (Compl. ¶ 1).  In December 1995, Han founded plaintiff Peninsula Asset Management (Cayman) Ltd. ("Peninsula") to engage in the business of providing financial services to investment banks in international finance centers.  It is undisputed that at the time of the incidents alleged in the complaint, Peninsula  provided financial services related to structured investments.[1]

Defendant Hankook Tire Co., Ltd. ("Hankook")[2] is a global corporate conglomerate organized and existing in the Republic of Korea, whose stock is publically traded in Korea. In 1991, Ohio granted Hankook a permanent license to transact business in the state and it has maintained a business office in Ohio ever since. Yang-Rae Cho ("Cho") is a citizen of Korea and a director of Hankook.   He is the chairman of Hankook's Board and is alleged to be a controlling shareholder of Hankook.  (Compl. ¶¶  7, 34). By previous Order, Cho was dismissed as a defendant in this case for lack of personal jurisdiction. See Docket No. 143, Order at 3.

_____

[1]Han is currently the sole director and shareholder of Peninsula.  Park was an initial director and, after resigning, was appointed by Peninsula as agent or officer from time to time. (Compl. ¶ 1).

[2]In the late 1990s, Hankook Tire Manufacturing Co., Ltd. changed its name to Hankook Tire Co., Ltd.  (Compl. ¶ 2).  It is interchangeably referred to in the complaint as "Hankook" and "Hankook Tire."  The Court uses only the designation "Hankook."

3

(5:04 CV 1153)

Plaintiffs allege that, from August 1996 through at least December 2002, Hankook engaged in flagrant accounting fraud using very complicated financial techniques involving formation of overseas slush funds which generated profits through surreptitious insider trading by secret "paper companies" established in Malaysia. (Compl. ¶¶ 6, 8). Plaintiffs allege that these transactions were permitted by Hankook's managers, in violation of their fiduciary duties, in order to facilitate a money-laundering scheme designed to be a lucrative tax shelter for Cho. (Compl. ¶¶ 34-35). Defendant denies those allegations.

**From 1996 to 1998:**

However, it is undisputed that in or around August 1996, defendants formed three investment companies in Malaysia: (1) Jade Investment (L) Limited ("Jade"); (2) Jahama Investment (L) Limited ("Jahama"); and (3) Ocean Capital Investment (L) Limited ("Ocean"). (Compl. ¶ 36). It is alleged that Jade and Jahama were to operate as investment vehicles through which Cho could trade in shares of Hankook stock; Ocean was to operate as a holding company for any profits realized from the investments. (Compl. ¶ 37). Defendant denies that Ocean was to operate as a holding company for profits, but does not dispute most of the facts that follow related to the reasons for the creation of the three companies.

Both parties agree that Yokohama Rubber Company (Yokohama) caused the need for Hankook and Cho, based on the advice of counsel, to create Jade and Jahama. In 1996, Yokohama. held approximately 13% of Hankook's stock, which it wanted to sell. See Plaintiffs' Response to Defendant's Motion for Summary Judgment, Docket No. 165-11. To avoid the sale of the shares on the open market and the likely drop in price for Hankook, Defendant sought

(5:04 CV 1153)

advice from Daewoo Securities and a Hong Kong law firm, Kim & Chang.  These advisors recommended that Jade and Jahama be created as Malaysian corporations to purchase and hold the shares that Yokohama wanted to sell for three years, until 1999.

Plaintiffs allege it was a no lose situation for Hankook and, in particular, Cho. If Hankook's stock price rose in those three years, then profits would be gained from its sale to Cho's benefit. If the stock lost value, Hankook, it seems, agreed to buy back the stock at a loss. Plaintiff alleges that the private guarantee by Hankook violated Korean securities laws.

In or around October 1996, Jade and Jahama raised $41 million (US) by issuing debt instruments.  Jade and Jahama then used the funds to purchase 13.1% of the total outstanding shares of Hankook stock.  Simultaneously, Cho and Jade/Jahama entered into side-letter agreements the effect of which gave all gains and losses from the investment in shares to Cho, which is again alleged to be  in violation of Korean laws.

**1998 and Allegations of Fraud**

According to the allegations of the complaint, in late 1997, a financial crisis hit Korea and, by late 1998, Hankook's share price dropped below half the October 1996 purchase price. This meant Jade and Jahama, and ultimately Cho and Hankook, would have insufficient funds for repayment of the $41 million debt coming due in  October 1999.

Defendant denies those allegations and instead focuses on the fact that because the Jade and Jahama notes were coming due, Hankook again sought advice from its financial counselor Daewoo to determine how to redeem the maturing notes.  It is undisputed that Daewoo recommended Plaintiffs to Defendant because of Plaintiffs' expertise in dealing with offshore

(5:04 CV 1153)

funds.  In late 1998, Plaintiffs were retained to enable Ocean, one of the Malaysian offshore

corporations, to raise money in the international financial market to redeem the Jade and Jahama

notes.

     Peninsula agreed to serve as placing agent and Plaintiff No Joon Park played a leading

role in terms of structuring the transaction. On October 11, 1998, Ocean and Peninsula entered

into a Placing Agreement for the placement of notes to be issued by Ocean. See Docket No. 163,

Exhibit A. The Placing Agreement contains the indemnity provision described _infra_ that forms

the basis of Plaintiffs' breach of contract claim.

     Plaintiff Park prepared the legal documents and authored the Placing Agreement.[3] He

also sought and received legal opinions from two different sources concerning the transaction

involving Ocean. Plaintiff Park explained the transaction on behalf of the parties to the financial

institutions involved. Docket No. 163, Exhibit I, Deposition of NJ Park, at 154, 238-239.  It is

undisputed that Peninsula was paid approximately $140,000 for its services.

     Pursuant to the Placing Agreement, Plaintiffs were directed to place $20 million of Zero

Coupon Notes due 2003 with the Korea Long Term Credit Bank ("KLTCB") on December 23,

1998 and, further, to transfer the proceeds to Ocean's account in New York City.  (Compl. ¶ 10,

40). The transaction went forward as planned; however, the source of the monies for purchase at

the KLTCB came from entities related to Defendant, a detail that Plaintiffs claim they knew

_____

[3]Plaintiff Park testified that he authored the Placing Agreement. See Docket No. 163, Exhibit I at p. 154. In its Response to the Motion for Summary Judgment, Plaintiffs argue that at most Plaintiff Park supplied a form agreement that he did not author. The issue is important because ambiguities in the document are resolved against the party that authored, or, in the Court's view, provided the agreement. In either case,  the document came from the Plaintiffs.

(5:04 CV 1153)

nothing about and is further evidence of Defendant's pattern of illegal conduct. Defendant

alleges that at the time the transaction was performed, the use of related entities to purchase the

notes was not forbidden.

> Paragraph 77 of Defendant's answer states:
>
> KLTCB, as an institutional investor, purchased the Ocean Notes in accordance
> with the procedures prescribed by the FXM Regulations in force at the relevant
> time. Essentially, KLTCB purchased the Ocean Notes using a special purpose
> cash trust account that was operated by certain affiliates of HANKOOK.

Answer, Docket No. 9 at para. 77.

Hong Heo, a former employee of Hankook who was responsible for the management of

the Jade and Jahama corporations in 1998, was introduced to Plaintiff Park through Defendant's

advisor Daewoo.  Heo testified that in 1998 he (Heo) fully discussed all of the funds, Jade,

Jahama and Ocean with Park. According to Heo, all of the records and files on these Malaysian

corporations were provided to Park in 1998 and Defendant relied heavily on Plaintiffs' expertise

to complete the transaction. Docket No. 163, Exhibit H, at 28-29, 75-76, 131-132.

Plaintiff Park now claims that he saw some yet not all of the documents at the time of the

transaction, but admits that he could have seen more documents if he had requested them.

Docket No. 163, Exhibit I at 191-192.

**From 2001 on and Allegations of Damages**

Plaintiffs allege that problems with the Ocean transaction began to surface in early 2001,

when it is claimed that rumors began to circulate in Korea and Hong Kong, where most of

plaintiffs' clients were regionally headquartered, that plaintiffs had been implicated in serious

stock manipulation schemes. As a result, Plaintiffs claim, its business began to suffer. The Court

7

(5:04 CV 1153)

is not directed to evidence in the record of who might have spoken those rumors. Plaintiffs claim to have and seek to submit evidence of lost profits. Defendant objects to the basis of the testimony submitted and the sufficiency of that evidence.[4]

In November 2001, Korean authorities offered an opportunity for voluntary reporting of any illegal offshore funds and provided a three-month grace period for doing so.  Plaintiffs allege they made several attempts to contact Hankook to voluntarily file a report on Ocean..

In March 2002, having ascertained that neither Hankook nor Cho had made a voluntary report, plaintiffs allege that they retained legal counsel in Hong Kong and sent a demand letter to Hankook for remedies under the indemnity provisions of the placing agreements with Ocean. (Compl. ¶ 20).  It is undisputed that several meetings were held between the parties in 2002. Defendant alleges that Plaintiff Park made several illegal proposals to deal with Ocean and potential reporting requirements. Plaintiffs deny that Park made illegal proposals.

In or around August 2002, defendant made a voluntary report concerning Jade, Jahama and Ocean to the Financial Supervisory Service or FSS, Korea's equivalent of the SEC.  An investigation by a related Korean regulatory body led to an order on December 24, 2002, that Hankook was to reflect the offshore corporations on its financial statements and that the guarantee to repurchase the shares was improper. No further sanctions were ordered.  Plaintiffs claim damages as a result of the violations assigned to Defendant Hankook.

---

[4]Because the Court grants Defendant's Motion for Summary Judgment on other grounds, the Court does not address Defendant's arguments that Plaintiffs have failed to submit evidence of damages to create a material issue of fact of that issue.

(5:04 CV 1153)

Plaintiffs also claim that by participating in the Ocean transaction, Plaintiffs were made to engage in illegal conduct. See Complaint, at paragraph 14. Yet, there is no evidence submitted that Plaintiffs were sanctioned in any way for any conduct arising out of their dealings with Defendant.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 . When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962). However, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. See Lujan v. National Wildlife Federation, 497 U.S. 871, 888-89 (1990). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts . . . earlier deposition testimony." Reid v. Sears Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986) (citing Biechell v. Cedar Point, Inc.,

9

(5:04 CV 1153)

747 F.2d 209, 215 (6th Cir. 1984)); but see Baer v. Chase, 392 F.3d 609, 623-26 (3d Cir. 2004) (noting that a so-called "sham" affidavit need not be disregarded if there is "independent evidence in the record to bolster [the] otherwise questionable affidavit").  Further, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1477 (6th Cir. 1989) (quoting Anderson v. Liberty Lobby, 477 U.S. at 252).  In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, 477 U.S. at 250.  Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251- 52.  See also Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 578 (6th Cir. 2003) ("[t]he conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment").

## DISCUSSION

As the Court has previously indicated, Plaintiffs assert claims of fraud/fraudulent inducement, negligent misrepresentation, civil conspiracy and breach of contract.  They seek compensatory and punitive damages and ask to pierce Ocean's corporate veil to get to Hankook under the indemnity provisions of the Placing Agreement with Ocean.[5]

---

[5]By prior Order, the Court has held that "based on plaintiffs' repeated representations, the
(continued...)

10

(5:04 CV 1153)

Defendant's motion for summary judgment puts the complaint's claims to the test by challenging its legal and factual allegations.  However, the Court notes that the breach of contract claim dominates the briefing of this matter. Defendant devotes most of its arguments to the contract claim. By way of its response brief, Plaintiffs devote all of their attention to the contract claim except one page each to the Fraud/Fraudulent Inducement and Negligent Misrepresentation claims. Plaintiffs offer no response to Defendant's challenges to the Civil Conspiracy claim.

**Breach of Contract**

The complaint makes several general and one specific allegation of breach of contract. The specific allegation is contained in para. 64, which states: "Defendants failed to fulfill their contractual obligations, without any legal excuse. The breaches include, but are not limited to Defendants' failure to honor its indemnity obligations under the Placing Agreement."

Defendant correctly points out that the path to success for this claim requires Plaintiffs to demonstrate that there are facts in the record sufficient to support the allegation that the indemnification provision of the Placing Agreement signed by Ocean and Plaintiffs was breached by Ocean.  Ocean's breach would then need to be imputed to Defendant by the Court concluding that the corporate veil should be pierced and Defendant may be found to be liable for the breach.

---

[5](...continued)
individual plaintiffs are making no claim for lost profits or any economic damages by the individual plaintiffs." Order Adopting Special Master's Discovery Order, Docket No. 132 at 1.

(5:04 CV 1153)

This is a diversity action and Plaintiffs' state law causes of action are presumed to be considered according to the laws of the forum state, in this case, Ohio law. Conflict of laws principles become necessary where there is an actual conflict between the laws of the forum state and that of another jurisdiction.  Gouge v. Bax Global, Inc., 252 F. Supp. 509, 521 (N.D. Ohio 2003). The party seeking the application of foreign law must demonstrate that an actual conflict exists.  "Where the party seeking the application of foreign law fails to demonstrate a conflict, Ohio law governs." Id.

Although the parties have made several citations to foreign authorities, there are no conflicts alleged when it comes to resolving the effect of the indemnification provision at issue in this contract. Accordingly, Ohio law is applied to resolve this part of the dispute.

The parties agree that the Placing Agreement governed the terms of Plaintiffs' representation of Ocean. As part of that agreement, Ocean agreed to indemnify Plaintiffs pursuant to the following provision which states in relevant part:

> The Company [Ocean] undertakes with the Placing Agent for that Placing Agent [Peninsula] and as trustee for each of its Placing Agent Persons that it will indemnify that Placing Agent and each of its Placing Agent Persons (on terms whereby each such person shall have an independent right of action) against all actions, liabilities, claims, demands, proceedings and judgments made or established against that Placing Agent, or any of its Placing Agent Persons and against all losses, liabilities, costs, charges and expenses (including legal fees and expenses) which that Placing Agent and any of its Placing Agent Persons may suffer or incur or may be made against that Placing Agent or any of its Placing Agent Persons in connection with or arising out of: . . . .
> (d) any breach or alleged breach of the laws or regulations of Malaysia, Korea, and  United States of America or any territory or possession thereof or elsewhere resulting from the issue of the Placing Notes or the implementation of the Placing or the distribution of the Private Placing Memorandum or the entering into or completion of this Agreement or the Material Contracts.

(5:04 CV 1153)

December 11, 1998 Placing Agreement, Doc. No. 163, Exhibit A at 9 (emphasis added).[6]

Defendant raises several arguments in an effort to demonstrate why Defendant Hankook cannot be held responsible according to the indemnity provision above for any of the harms alleged by Plaintiffs.

Defendant first argues that under Ohio law,  indemnity provisions in a contract may only address claims made by third parties against the party in the contract to be indemnified. This is important to Defendant because no third parties have lodged claims against Plaintiffs for which Plaintiffs seek damages.  "As a matter of law, indemnity agreements do not extend to losses between the contracting parties." Defendant's Motion for Summary Judgment, Doc. No. 163-1 at 18. Defendant cites Mead Corp. v. ABB Power Generation, Inc., 319 F.3d 790 (6th Cir. 2003) in support of this argument.

Mead was also a diversity action applying Ohio law. Plaintiff Mead Corporation sought reimbursement from Defendant ABB Power Generation for a failed turbine. In the contract of sale there were two indemnification provisions. The Sixth Circuit found there was a conflict within the contract before it, with one article of the contract applicable to both third party claims

_____

[6]Both parties cite only (d) of the indemnification requirements. The rest of the agreement requires Ocean to indemnify Plaintiffs against any losses, liabilities, etc. arising out of "(a) the dispatch of the Private Placing Memorandum and the allotment and issue of the Placing Notes; (b) any claim that the Private Placing Memorandum is untrue, inaccurate or misleading; (c) any breach by the Company of any of the terms of this Agreement or of any of the representations and warranties set out herein or therein or the failure of the Company to issue the Placing Notes with good title free from all liens, charges or encumbrances; ... (e) the performance by the Placing Agent of its services to the Company in connection with the Placing Notes or the preparation and distribution of the Private Placing Memorandum; or (f) any of the transactions contemplated by this Agreement or the Material Contracts, save insofar as the same is due to breach of this Agreement by that Placing Agent or any of its Placing Agent Persons, or its or their negligence or willful default."

13

(5:04 CV 1153)

and claims between signing parties, and a different article only providing for indemnification against third party claims. Because the contract was ambiguous on the issue of providing for indemnification for the other party's acts, the Sixth Circuit construed the agreement against the drafter of the agreement and found that only third party claims would be permitted and denied Mead's claim. Mead, 319 F.3d at 798.

In reaching this conclusion, the Sixth Circuit offered a helpful summary of Ohio law on the issue of indemnification agreements. The general rule in Ohio, the Court stated, is that "an indemnity provision applies both to third-party reimbursement situations and to direct losses suffered by the contracting parties themselves." Mead, 391 F.3d at 798, n. 3 citing Battelle Memorial Institute v. Nowsco Pipeline Services, Inc., 56 F. Supp. 2d 944, 950-51 (S.D. Ohio 1999).

The Court in the instant case follows this general rule and therefore disagrees with Defendant that indemnity provisions only apply to third party claims. However, to determine exactly what the indemnitor, Ocean, has promised to do,  the Court must examine the language of the agreement.

The first half of the indemnity agreement does limit itself to third party claims. However, beginning with the underlined portion of the agreement as indicated above, the second part of the paragraph provides that Ocean will indemnify Plaintiffs for the enumerated harms described in subparagraphs (a) through (f). Both of the parties in their briefs direct the Court's attention only to (d) which provides that "any breach or alleged breach" of the laws of Korea, Malaysia or the

14

(5:04 CV 1153)

United States and any damages to Plaintiffs resulting therefrom, would require indemnification under the Placing Agreement.

Defendant argues that the paragraph is ambiguous, because it promises to indemnify against third party claims in the first half and then provides for reimbursement to Plaintiffs by Ocean directly in the second part. Because Plaintiffs drafted the Placing Agreement, this alleged ambiguity must be construed against the drafters and only claims made by third parties ought to be given effect.

The Court again disagrees, and finds that the indemnification provision in the Placing Agreement is fairly straightforward in terms of what it provides as cleanly divided between the two parts. In the second part, the Placing Agreement specifically lists those areas for which Ocean will be obligated to Plaintiffs for harms that occur as a result of Ocean's conduct. As the agreement at (d) provides, if Ocean has violated or been alleged to have violated the law of those listed jurisdictions, then Plaintiffs may receive damages as a result of the harms they suffer related to those violations or allegations.

After reading the complaint, and examining the summary judgment motion and response, and the evidence submitted by the parties, the Court expected to find records of an investigation and citations issued by the South Korean equivalents of the SEC against Ocean for the scheme described by Plaintiffs.  A violation by Ocean is required to trigger the indemnity provision of the Placing Agreement.  Yet it is undisputed that Ocean was not cited for securities violations

15

(5:04 CV 1153)

nor is there any evidence of an investigation or allegations made by South Korean securities officials against Ocean.[7]

However, Plaintiffs argue that the Court should first pierce the corporate veil between Ocean and Hankook. With that done, the violations by Hankook of Korean law in regard to its failure to report the off the books transactions would become those of Ocean and Plaintiffs would then have the breach of the Placing Agreement they allege. Defendant calls this "a backward-piercing theory."

The Ohio Supreme Court stated as follows:

Thus, the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

Belvedere Condo. v. R.E. Roark, 67 Ohio St. 3d 274, 289 (1993) citing Bucyrus-Erie Co. v. Gen. Products Corp., 643 F.2d 413 (6th Cir. 1981).

Assuming, arguendo, that Plaintiffs have come forward with evidence sufficient to support the first and third parts of this test, the problem arises for Plaintiffs with the second element. As the Belvedere court described this part of the test: "The second element is the

---

[7]Plaintiffs may argue that Plaintiffs made allegations of wrongdoing against Ocean to the Korean authorities.  The Court concludes that the Placing Agreement does not provide for allegations of wrongdoing that Plaintiffs make against Ocean, only allegations made by the regulatory officials charged with the responsibility for conducting investigations that would lead to charges.

(5:04 CV 1153)

requirement that the shareholder's control of the corporation proximately caused the plaintiff's injury or loss." Id.

In this case, the proximate cause of the injury and the alleged loss is based on a violation of the Placing Agreement. In the absence of evidence that Ocean violated the Agreement, there is no loss to be found based on the breach of contract allegation and no thus no wrongdoing from Hankook's alleged control of Ocean.

Plaintiffs response brief, Doc. No.165-1 at 34, itself demonstrates the problem with the recovery it seeks. Plaintiffs claim that Ocean is "a sham offshore fund account set up by Hankook  who is responsible for its refusal to honor the indemnity obligation." Plaintiffs' Response Brief, Doc. No.165-1 at 34.  Plaintiffs seek to impute a breach of their agreement with Ocean to Hankook without first showing a violation of that agreement.  The Court holds that there must  first be evidence of a violation by Ocean before Ocean, and by extension Hankook, can be said to have refused to honor the indemnity agreement.

This result is undoubtedly a difficult one for Plaintiffs. The road to the courthouse has been a long and difficult one based on jurisdictional issues. Discovery was hard fought and expensive. It required the appointment of a special master to reign in the issues, parties and counsel in this trans-Pacific litigation. Yet, the law does not permit the Court to disregard the corporate form in the manner sought by Plaintiffs. Defendant offer citations in support of the Court's conclusion in the form of several unreported Ohio decisions that hold that in the absence of liability in the first instance, the corporate form may not be disregarded to find the controlling shareholder liable.

17

(5:04 CV 1153)

Piercing the corporate veil is an equitable doctrine and for that reason might permit the Court to allow Plaintiffs to proceed where justice would so require. But equity counsels against a broader application of the doctrine in this case. Plaintiffs knew that they were not signing an indemnity agreement with Defendant and, as part of its negotiations, had the opportunity to seek a guarantee from Defendant to provide the remedy Plaintiffs now seek. With that additional consideration in mind, and for the reasons stated, the Court grants Defendant's Motion for Summary Judgment on Plaintiffs' breach of contract claim

**Fraud/Fraudulent Inducement**

Plaintiffs make the following argument  in support of their fraud claim:

> Defendant made numerous misrepresentations to Plaintiffs. Among them, Defendant claimed that it had lawful and legitimately established Jade, Jahama, and Ocean as its subsidiaries. When in fact, Defendant set up the entities using related third party individuals that Defendant could control. Defendant stated that it intended to legally raise capital. Defendant expressly stated that it intended to honor the indemnity in the Placing Agreement. When in fact, Defendant never intended to honor the provision as evidenced by its conduct.

Plaintiffs' Opposition to Motion for Summary Judgment, Docket No. 165 at 40.

The Court first notes that Plaintiffs offer only a brief argument in defense of the fraud claim which contains no citations to the record to establish the fraud alleged. At summary judgment, Defendant may move, with or without supporting materials for summary judgment as to any or all of Plaintiffs' claims.  In the face of a summary judgment motion,  Plaintiffs must submit evidence sufficient to support the claim. A  fraud claim under Ohio law requires such supporting evidence as to the following six elements:

a) a representation or where there is a duty to disclose,  concealment of a fact;
b) which is material to the transaction at hand;

18

(5:04 CV 1153)

>       c) made falsely with knowledge of its falsity or with such utter disregard and
>       recklessness as to whether it is true or false that knowledge may be inferred;
>       d) with the intent of misleading another into relying upon it;
>       e) justifiable reliance upon a representation or concealment; and
>       f) a resulting injury proximately caused by the reliance.

<u>Burr v. Stark Cty. Bd. of Commrs.</u>, 23 Ohio St. 3d 69, 73 (1986); <u>Watkins v. Cleveland Clinic</u>

<u>Found.</u>, 130 Ohio App. 3d 262, 277-278 (8th Dist. 1998); <u>Bellios v. Victor Balata Belting Co.</u>,

724 F. Supp. 514, 519 (S.D. Ohio 1989).

The Court is of the view that the period in late1998 is a critical stage to Plaintiffs'

allegations that Defendant engaged in fraud and negligently misrepresented the terms of the

proposed arrangement to Plaintiffs. Plaintiffs make three general allegations of fraudulent

misconduct:(1) that Defendant expressly stated that Defendant would honor the indemnity

agreement between Ocean and Plaintiff;  (2) that Defendant represented that the transaction

would be legal; and  (3)  Jade, Jahama and Ocean were not subsidiaries, but were instead closely

controlled independent corporations.

As to first allegation of fraud, the Court cannot find any evidence in the record of a

statement attributable to one of Defendant's officers or agents or any sworn statement by

Plaintiffs to support the claim that Defendant made an express promise, verbally or in writing, to

honor the indemnity provision of the Placing Agreement.

As to the second claimed element of fraud, Defendant continues to maintain that at the

time the transaction was entered into, it was in fact legal based on the different legal opinions

that both Defendant and Plaintiffs received. Defendant argues that changes in the law after 1998

led to the changes in the reporting requirements for offshore corporations like Jade, Jahama and

(5:04 CV 1153)

Ocean, which then led to finding of violations in 2002. As part of its motion for summary

judgment, Defendant challenges Plaintiff to show that the offshore reporting requirements were

violated in 1998. See Motion for Summary Judgment, Docket No. 163, at 15. Plaintiffs offer no

evidence to demonstrate that the transaction was illegal at the time it was entered into. Further,

Plaintiffs have not supplied evidence of Defendant's concealment of known facts to demonstrate

that Defendant knew they were engaging in illegal conduct.

Finally, Plaintiffs allege that the corporate form of the offshore corporations was

materially misrepresented to them. However,  Plaintiffs cite no statements attributable to

Defendant or its agents from the 1998 time frame to support their claim that they were misled

into believing that Jade, Jahama and Ocean were subsidiaries rather than independent yet closely

controlled corporations.

In its factual statement in response to the motion for summary judgment, Plaintiffs point

to one place in the record wherein defendant is accused of  "misrepresent[ing] that Jade, Jahama

and Ocean were legitimate subsidiaries of Hankook to make Plaintiffs believe that the

contemplated issuance of Ocean notes was part of Hankook's legitimate corporate activities."

Docket No. 165 at 16. JC Lee, who was the Finance Team chairman at Hankook in 1998, recalls

meeting Plaintiff Park in 1998. However,  Lee's testimony at his deposition states that his

discussions with Park took place in 2002, when Park was questioning Defendant's actions and

asking for damages. Defendant's Motion for Summary Judgment, Exhibit O, Dep. of JC Lee at

0063:14-17 and 0044:1-7.

(5:04 CV 1153)

Plaintiffs seek to create a material issue of fact by way of an affidavit filed along with Plaintiffs' response to the motion for summary judgment.  In the affidavit, Plaintiff NJ Parks states:

> 9. In 1998 Peninsula was introduced to Hankook Tire Co., Ltd. Officers and employees of Hankook Tire Co., Ltd. represented to me that Jade, and Jahama were subsidiaries of Hankook Tire Co., Ltd. and that Ocean was also to be a subsidiary of Hankook Tire Co., Ltd. I was also told that Hankook Tire Co., Ltd. wanted to issue Ocean notes which involved transactions with Jade and Jahama as part of legitimate corporate activities. Peninsula and I relied on these representations which we had no reason not to believe. I later discovered that Hankook Tire Co., Ltd. in fact engaged in illegal acts involving Jade, Jahama, and Ocean.

Plaintiffs' Response to Motion for Summary Judgment, Docket No. 165-10 at 3, para. 9.

However, even the affidavit, which contradicts Plaintiff Park's earlier deposition testimony, is not sufficient to create a material issue of fact. The affidavit provides no specifics in terms of who made the allegedly fraudulent statements. Conclusory allegations are insufficient to defeat a motion for summary judgment, especially when the claim is based upon fraud, which must be both plead, and those claims supported, with particularity. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990).

While the Court previously denied Defendant's motion to dismiss the fraud claim, at summary judgment Plaintiffs are put to the test to identify evidence in the record to support the claim. As stated in the Court's preceding summary judgment standard, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

21

(5:04 CV 1153)

Where, as here, they failed to do so, the Court concludes that Defendant's motion for summary

judgment on the fraud/fraudulent inducement claim must be granted.

**Negligent Misrepresentation**

Plaintiffs offer the same evidence, again without citation to the record, in support of their

claim of negligent misrepresentation.  First, "that Defendant claimed that it had lawful and

legitimately established Jade, Jahama, and Ocean as its subsidiaries. When in fact, Defendant set

up the entities using related third party individuals that Defendant could control." Second,

"Defendant stated that it intended to legally raise capital." Third, "Defendant expressly stated

that it intended to honor the indemnity in the Placing Agreement. When in fact, Defendant never

intended to honor the provision as evidenced by its conduct." Plaintiffs' Response to Motion for

Summary Judgment, Docket No. 165, at 40-41.

In Ohio, the tort of negligent misrepresentation is also called "affirmative negligent

misrepresentation," which underscores the fact that a statement, not an omission, is required for

the claim. The elements of the claim are:

> "(1) One who, in the course of his business . . . supplies false information for the
> guidance of others in their business transactions, is subject to liability for
> pecuniary loss caused to them by their justifiable reliance upon the information, if
> he fails to exercise reasonable care or competence in obtaining or communicating
> the information."

Zuber v. Dept. of Insurance, 34 Ohio App. 3d 42, 45 (10th Dist. 1986), quoting from Haddon

View Investment Co. v. Coopers & Lybrand, 70 Ohio St. 2d 154 (1982).

As the Court has previously indicated in responding to the same allegations of

wrongdoing for the fraud claim, there is insufficient evidence submitted of an affirmative

22

(5:04 CV 1153)

negligent misrepresentation upon which Plaintiffs may base their claim. Accordingly,

Defendant's motion for summary judgment as to the negligent misrepresentation claim is

granted.

**Civil Conspiracy**

Plaintiffs offer no response to Defendant's motion for summary judgment as to the claim

of civil conspiracy. The Court finds no evidence to support the claim and accordingly, the

motion for summary judgment as to Count 4 of the Amended Complaint is granted.

**Other Pending Motions**

As part of its motion for summary judgment, Defendant also argues that Plaintiffs have

failed to demonstrate damages. See Motion for Summary Judgment, Docket No. 163 at 24-30,

37-40. It is not necessary for the Court to address this additional argument.

Also, because the Court has granted Defendant's Motion for Summary Judgment, the

remaining pending motions no longer present issues necessary for resolution. None of the

motions involve evidence that the Court has relied upon for its decision in chief. Accordingly,

for record purposes, the Court denies as moot Defendant's  motions to strike (Docket No. 168)

and  to exclude the testimony of Plaintiffs' expert (Docket No. 169). The Court further denies as

moot the motions to strike filed by Plaintiffs (Docket Nos. 176-179).

**CONCLUSION**

For the reasons stated, Defendant's motion for summary judgment (Doc. No. 163) is

granted.  Further, the Court denies (1)  Defendant's motion to exclude the testimony of the

expert (Doc. No. 169), (2) Defendant's motion to strike (Doc. No. 168), and (3)  Plaintiffs'

(5:04 CV 1153)

Motions to Strike (Docket Nos. 176-179) as moot. Finally, the Court has considered the issue of reliance on foreign law at various points in this Memorandum Opinion as the matter is required to be resolved. Insofar as Doc. Nos. 161 and 162 have been been filed as "motions" to apply foreign law, they are also denied as moot.


      IT IS SO ORDERED.


  October 13, 2006                                  *s/ David D. Dowd, Jr.*
Date                                        David D. Dowd, Jr.
                                            U.S. District Judge